And we'll have the argument in the next matter on the argument calendar. Amorodion v. Garland, 182588. Amorodion v. Garland, 182588. Good morning. Good morning, Your Honor. May it please the Court, I'm Thomas Mosley, counsel for the petitioner, Ms. Amorodion. The Board of Immigration Appeals committed a fundamental error in reversing the immigration judge's grant of deferral under the Convention Against Torture for this government cooperator. Under the law, settled law, the prediction that someone will be tortured is itself a factual determination, the Huang case, matter of his own. And in this case, as the government admitted, brother, that determination could only be reversed for clear error. It's a factual determination. And the government admits, page 22 of their brief, that the Board of Immigration So, I mean, that in and of itself, I submit, undermines the Board's decision here. Moreover, since the Board was in essence making its own factual finding, those factual findings were improper to begin with and were not subject to substantial evidence review or support. The Board couldn't make its own decision with respect to the prediction of torture. So I think those two fundamental errors at the outset undermine the Board's decision. But when we dig deeper into the record under the review that this Court sanctioned in Ojo and Manning, we find that the Board made some very fundamental mischaracterizations of evidence. With respect to the Board's saying that there was no evidence to support Ms. Omerodian's testimony that the Allen family, against whose daughter she had cooperated to the tune of getting her 180-month sentence, that that family didn't have power and influence, there was nothing to corroborate that. First, Ms. Omerodian got to know her co-defendant very well, so she was in a position to testify to that. Moreover, the postal inspector, Inspector Alesi, and this is a rare case where the government agent testifies in support of a claim, he at page 217 notes that, of the record, notes that he had worked these so-called West African cases for 12 years and he was familiar with the power and influence of the family. And moreover, the affidavit from her half-brother also attests to the fact that under these circumstances, that family had the power. So the Board — It's the evidence that you've just been highlighting now that constituted the particularized evidence that that would have an effect on her, that the government would fail to protect her. Is that right? Yes. Absolutely. And it's the — it's not — you're absolutely right, Judge Carney. And I think the other focus where the Board went off base was in — it's not that the security people are interested in her. It's that they're going to turn a blind eye to what's happening here. And that, I think, was another fundamental error that the Board made. Now, the Board also faulted Judge Mulligan, who heard the evidence, about supposedly not assessing the possibility of internal relocation, but he actually did. And I think that another fundamental error here is the Board tries to create a — the Board erroneously creates a contradiction that doesn't exist. What Ms. Almirodian testified to was that she was so concerned that the family had such power that she wasn't going to make it past the entry. But she did say, with respect to relocation, that she could relocate within the country. What she said was — Judge Lord, what she said was that, you know, if I somehow make it past the entry I don't think I'm going to, that I might be able to go somewhere. But she didn't contradict the fact that — she didn't say that the Allen family wouldn't be able to locate her wherever she went. She made — she didn't testify that she would be in a position where she could safely go anywhere. I thought that she was asked and she did not indicate that she — that safety was the concern with respect to relocation. She indicated that, you know, financial difficulty was the concern. Well, she — Is that accurate? Well, she indicated that she might not be able to go anywhere, but she never denied the fact — the overarching fact that she's afraid of a family that would — that had power and influence and could stop her at the moment that she entered. And, you know, the judge assessed that. However, I think there's a fundamental error here in the board, in essence, putting the burden of relocation or denying relocation on her, which is contrary to this Court's — this Court's decision — this Court's decision in Manning. Finally, with respect to this issue about harm, the board says — the board says that, you know, there's no evidence — there's no evidence to support that the harm she might face would rise to the level of torture. Well, the submission by the postal inspector at — the submission by the postal inspector on behalf of all — all the investigators who work with Ms. El-Merodian said — said physical harm. And beyond that, the — the half-brothers affidavit talked about their being able to murder her. So, I mean, that's — that's certainly evidence of harm, of likely harm, rising to the level — rising to the level of torture. Because, I mean, the case law is really clear that — that murder is torture. So how do you — remind me, what is the standard of review here? The standard — the standard of review here is, as I submit, substantial evidence in that the only fact-finder, the only permissible fact-finder was the immigration judge who made those factual findings. And when the board tried to — when the — the only way that the board could reverse those factual findings was by clear error. And as I submit, the government, in its brief, says that that's not what the — that that's not what the Board of Immigration Appeals decision did here. So under those circumstances, I would submit that the board's decision should be reversed. Well, I thought that what the government said was that the — that the board determined that even if the findings — even if you set those at face value, that was the term, I believe, it does not give rise to the predictive determination that you mentioned in the beginning of your argument. But the predictive determination is itself a factual question, and only the immigration judge could — the immigration judge's factual determination in that regard could only be reversed, excuse me, by clear error, which was not done here, I submit. So fundamentally, your argument is that the — which is the way that you started, so I'm applauding you for this — is that the predictive determination is itself a factual determination. Absolutely. Thank you. And you reserved two minutes for the public. We'll hear from the government. Good morning, Your Honors, and may it please the Court. My name is Robert Coleman, and I represent the Respondent, the Attorney General. Just to clarify the standard of review issue here, my opposing counsel is correct. This is an instance where a predictive finding is being made as to what would happen in the future, specifically here whether torture would occur in the future by the more likely than not standard. And as the board correctly pointed out on page five of the record, that predictive finding is itself a finding of fact, and consequently the clear error standard does apply to that question. And the board applied that very standard in concluding that there was simply no evidence here to support the determination by the immigration judge that torture would occur here, much less that torture would occur here by the more likely than not standard. Well, I read the BIA as saying the immigration judge's findings of fact do not support a conclusion that the purported wealth and influence of the codependent's family would cause those authorities to have such an interest in her. So why isn't that itself a contrary finding of fact to the I.J.'s determination? It is drawing another factual inference, I guess, from what the I.J. found. And it seems to me that the I.J.'s finding was a reasonable one based on its review of the evidence. What the board here is pointing out is the dearth of evidence and just identifying that the evidence that was put forth does not add up to the conclusion that the immigration judge was arriving at. And there's good reason for that. Now, there are multiple parts of that. You just told us that – I thought you just told us that the – this is why I asked your friend on the other side, what is the standard here? And you answered – you started your answer and told us – I think it's right – that the predictive determination is itself a factual finding. That is correct. And so what the board here does is says that the board engages in that analysis because to determine whether there is evidence to support a finding, there needs to be some analysis of what the evidence is that's put forward. So the board does need to engage a bit with what the immigration judge found or the evidence weighed by the immigration judge. And here the board is simply saying that the evidence just does not add up to show that the – So other facts don't add up to show this particular fact. Well, yes, and that's part of the complication. This is a complicated case in the sense that you have underlying facts, essentially like the wealth of the petitioner, for instance, the influence of the family, the publicity of the hearing in Nigeria, for instance. And these are acknowledged by the board in several places, but on page five specifically. And the board then says, even assuming all of those to be true – so the board there is not making its own finding. It's acknowledging – it's deferring, despite having pointed out all the weaknesses in those findings. The board is saying, for the sake of argument, just deferring to those determinations made by the immigration judge, they still do not add up to the further predictive finding. This is the first sentence of the second-to-last paragraph on page five. These findings, even if accepted at face value, do not further – do not support the further predictive finding that the respondent would suffer any torture or acquiescence. And when the board says support, that is a proper application of the clear error standard because two paragraphs above where the board describes the proper clear error standard, it says that part of that is finding either that the findings are illogical or implausible or without support in inferences that may be drawn from the record. But the BIA seems to turn its decision on its statement further down at the bottom of page five that the influence of codefendant's family is such that the Nigerian authorities would acquiesce or turn a blind eye to such mistreatment. Why isn't that directly contrary to what the IJ found, who heard testimony about corruption in Nigeria and about the influence of the family, about the publicity, about the wealth of the family, about the interaction between the petitioner and the codefendant and so on? Why isn't that directly contrary to what the IJ found as a less predictive but more actual finding of fact? Well, I think there the board was covering its faces both ways and making, because if you look at the first sentence of the second paragraph on page five, the board says that it finds that the immigration judge erred as a matter of fact and a matter of law. So down at the bottom of page five, where I believe you were pointing, Your Honor, that is where the board is pointing out the legal error, which is arriving at the ultimate conclusion as to whether the burden is met. But above that, in the second-to-last paragraph, that's where primarily the board is engaged with the facts and the factual finding and describing the clear error that was committed here by making a determination that the leap in logic from the family allegedly having wealth, assuming that to be true, that that automatically or that you can make the leap in logic, that that means that they can influence authorities in Nigeria, where although there is some evidence in the record regarding corruption and abusive practices, there's no evidence in the record that the Nigerian authorities engage in this type of corruption that is alleged by Omarodian here. And you would think that there would be, given that there is a significant amount of country conditions evidence and there is a significant amount of evidence regarding abuses and corruption, but to say that the authorities engage in some corrupt practices is one thing, but to say that they would actually accept money to turn a blind eye to private individuals where one private individual is not just harming but is torturing another private individual. What is it that the agents said? As to what issue? As to that particular issue, if any. Well, the First Law Inspector, he engaged in some speculative testimony as he didn't have any direct knowledge as to what transpires in Nigeria. He was asked specifically if he's been to Nigeria for any other witnesses have been deported to Nigeria, and he said no. So he was simply echoing the evidence that was put forth by Omarodian. And as to the future, the chance of torture happening in the future, he offered a very speculative quote where he said, I do think that she possibly could, there could be some adverse repercussions for her if she went to Nigeria. And, again, what that's based on is nothing else other than the testimony given by Omarodian. Why, and I've been, I think, in this situation, but why, when another part of the executive seeks to help a petitioner, why would you get in the way of this and seek that petitioner's removal? Well, here we have a number of moving parts within the government at play. Let's focus on this other moving part. Sure. So I guess the question would be who is getting in the way of whom. But here the DHS was simply moving forward with grounds that they legitimately had to remove Omarodian here. And the Postal Inspector felt, I don't know how exactly it came about, but the Postal Inspector decided to weigh in on the case. Well, I can almost assure you that it's not without the approval of someone much higher up in the Postal Inspection Service. So let's assume that it's with the full approval of the Postal Inspection Service. Why? Then how is this resolved, this dispute, frankly, between DHS and the service? Well, it's resolved in that the Postal Inspector was allowed to say his piece at the hearing and offered some testimony, although, as I indicated, that testimony is based basically on assumptions made from Omarodian's testimony herself. And now we're playing it out through the courts to see really what the value of that evidence is. But here, as I just read the quote, it's based on pure speculation coming from the Postal Inspector, who may have felt that this was a sympathetic case, but in reality we're talking about an aggravated felony that Omarodian is convicted of here, that she pled guilty to, and that she was sentenced to 30 months in prison. That's after having received a very substantial benefit, essentially half off her sentence. That argument about what weight to give the Postal Inspector's testimony, given that's an argument that was made to the IJ. It was certainly available to the IJ. Yes, yes. And yet the IJ factually credits the Inspector's testimony. Yes. However, there isn't anything there to provide evidence that she would be tortured, because there isn't. All we have are Omarodian's tires having been slashed and purported threats communicated. Omarodian's brother's testimony that she would be killed is testimony that she'd be tortured. He said that he believes that – pardon me, I noticed I'm over time. May I answer? Of course. Okay. He indicated that – he just said that the co-defendant's family had wealth that would allow them or the resources to kill her, but then potentially any wealthy family would have such resources. There's an insufficient link in his affidavit between the wealth and an actual threat of killing. That is correct, and that's the theme that runs through this whole case, Your Honor. Thank you very much. Thank you. Respondent respectfully requests that this Court affirm. We'll hear the rebuttal. I would submit that there's a more than, Your Honor, and the immigration judge found a more than sufficient link between the wealth and power and influence of the family and the likelihood of torture. We have, obviously, as the immigration judge found, as the evidence confirmed, the motive of the family's death. Ms. O'Merodean's testimony put the – excuse me – the family's daughter in prison for 180 months. And the postal inspector and the agents weren't speculative. If you look at page 241 of the record, the affidavit, the letter submitted by the postal inspector, where he says, there is no doubt among government agents that Ms. O'Merodean testified under great duress and fear of retribution, we believe she faces a serious risk of emotional and physical harm if she is deported. You do not see that. And I come to this from my experience as an assistant U.S. attorney and now in private practice. You do not see. It is rare that you have government agents coming in to testify in support of someone's application for relief from removal under these circumstances. So the immigration judge proceeded on findings where you clearly had – where you had motive, means, and opportunity. If she's – Would you address the – I appreciate what you're saying about the government's declaration and also, in part, the affidavit from the relative. But would you address the government's argument about the predictive finding and that the underlying facts or underlying factual findings don't add up to the further predictive finding made by EIJ? The fundamental mistake in that argument I submitted before is that the Board of Immigration Appeals may have determined how it weighed those facts and determined that they didn't add up in its opinion. Was it – can it do that? It can't do that. It cannot do that. It has to say – It's not – What I'm saying is if it's going to reverse the immigration judge on that basis, it has to say he – that this factual conclusion of predictability was clear error, which it didn't, and which, frankly, the government virtually admits at page 22 of its brief. Thank you very much. We'll reserve the decision.